Whttaker, Judge,
delivered the opinion of the court:
On June 29,1947, plaintiff entered into a contract with the Veterans’ Administration, an agency of the defendant, for the education and training of veterans as private pilots, commercial pilots, and flight instructors. The term of the contract was from July 1,1947, to February 29, 1948.
On August 11, 1947, the Veterans’ Administration wrote plaintiff that “the training of veterans now enrolled with you is suspended effective the close of business August 12, 1947,” pending an investigation by the Civil Aeronautics Administration of reports indicating “that maintenance practices in your institution may not be sufficient to adequately protect the veteran in training.” On the same date Mr. Brisbin, who was the Chief of the Vocational, Rehabilitation and Education Division in the Regional Office of the Veterans’ Administration in San Antonio, Texas, sent two of his subordinates to plaintiff’s flying field with instructions to entirely separate from a training status the veterans then under training at plaintiff’s school.
Upon learning of this, plaintiff telephoned Mr. Brisbin, who informed him that complaints had been received that the aircraft used in the school were not airworthy. Whereupon, plaintiff agreed that he would cease operations pending the outcome of the investigation by the Civil Aeronautics Administration if Mr. Brisbin would agree not to separate the students from their training status, called “interrupting.” Mr. Brisbin said he would agree to this if this agreement was put in writing. Plaintiff, at the dictation of the representatives of the Veterans’ Administration then in his office, wrote them on August 12,1947, as follows:
Confirming my telephone conversation of this date with Mr. Arthur W. Brisbin, Chief, Training Section, *518 I do state that I have ceased operations as of close of business as of this date, August 12, 1947, and will not reopen operation until authorized by the proper anthorities of the Veterans’ Administration, and I also state that my records are available to representatives of the Veterans’ Administration and any other authorized agency, for inspection.
On August 11,1947, the representatives of the Civil Aeronautics Administration made an inspection of plaintiff’s aircraft and found them to be in airworthy condition, although they did find that two of the planes used by plaintiff at Freer, Texas, showed evidence of a lack of routine maintenance and upkeep. Plaintiff was advised of this. The Civil Aeronautics Administration so reported to the Veterans’ Administration on August 14, 1947.
This report was received in the Regional Office of the Veterans’ Administration on August 17, 1947; but, even so, plaintiff was unable to secure permission to resume training. He telephoned Mr. Brisbin a number of times, without results. He then enlisted the aid of his attorney, and he and his attorney, as well as Colonel Pearcy, the Director of Flying at the Laredo Municipal Airport, went to San Antonio on August 15, 1947, to interview Mr. Brisbin. Mr. Brisbin informed them that the only thing holding up permission to reopen training was the lack of this report showing that the airplanes were in airworthy condition, but he stated that this report had not been received.
Still not hearing from Mr. Brisbin, plaintiff telephoned the inspector of the Civil Aeronautics Administration on August 18,1947, who informed him that the report had been sent in to the. Veterans’ Administration. On the same day plaintiff went back to San Antonio to see Mr. Brisbin, accompanied by his attorney and Colonel Pearcy. Before calling on Mr. Brisbin, however, these gentlemen called on Mr. Burns, the inspector of the Civil Aeronautics Administration, who had examined plaintiff’s airplanes, and requested him to telephone Mr. Brisbin to inquire if the report had been received. Mr. Brisbin made the astonishing reply that the Veterans’ Administration was not ready to receive the report.
*519 On the day before, the report had been received at the Regional Office, but had not arrived in the office of Mr. Brisbin.
Two days later, plaintiff and his attorney and Colonel Pearcy again went to the Regional Office of the Veterans’ Administration in San Antonio. This time they saw Mr. Harlan, who was the head of the Regional Office. Mr. Harlan, talked with Colonel Pearcy and plaintiff’s attorney, but not with plaintiff. He told these gentlemen that the suspension of training at the school, on the ground that plaintiff’s airplanes were not airworthy, was a ruse to permit the defendant to investigate a report that plaintiff had defrauded the Government of a considerable sum of money. He stated that he was requesting the Federal Bureau of Investigation to investigate this report, and was holding up permission for plaintiff to resume, operations until after a report from the Federal Bureau of Investigation had been received.
Defendant takes exception to this finding of the Commissioner, but the testimony to this effect stands uncontradicted. Defendant did not put Mr. Harlan on the stand. Colonel Pearcy had died before the taking of testimony was begun.
On August 22,1947, a special agent of the Federal Bureau of Investigation called at plaintiff’s school and made an investigation of his books and records; but plaintiff was denied permission to inspect his report, and the agent declined to tell him what it contained, but referred him to the United States District Attorney.
Plaintiff was unable to get in touch with the United States Attorney until November 1947. At that time the United States Attorney informed plaintiff’s attorney that the Federal Bureau of Investigation’s report disclosed a few discrepancies in favor of the Government and a few in favor of plaintiff, but that the net amount of such discrepancies amounted to only about $60.00, and that, therefore, there would be no prosecution.
The suspicion of fraud was, therefore, without foundation.
When plaintiff’s school was closed on August 12,1947, the Veterans’ Administration was indebted to it in the sum of approximately $80,000; but these funds were withheld pending conclusion of the investigation by the Federal Bureau of *520 Investigation. It was not until after the United States Attorney had advised the Veterans’ Administration that it would not seek an indictment against plaintiff, that the amount due was remitted. This was in December 1947.
Plaintiff had borrowed money from a bank in Laredo to finance the purchase of airplanes to be used in giving flying lessons. This note was payable in installments. On August 12, 1947, the plaintiff owed the bank a balance of approximately $30,000 and plaintiff was without funds to pay the debt. This fact, presumably, together with his failure to secure permission to reopen the school after receipt of the favorable report on the condition of his airplanes, and the apparent unwillingness of the trainees to wait around indefinitely for the school to reopen, induced plaintiff to lease his aircraft and operating facilities on September 9,1947, to one E. A. Brown. Since under the regulations of the Civil Aeronautics Administration not more than one air agency certificate could be issued for the same aeronautical facilities and equipment, plaintiff surrendered his certificate, in order that a new one might be issued in lieu thereof to Mr. Brown. Such a certificate was issued to Mr. Brown, and the Veterans’ Administration on October 29,1947, entered into a contract with him for the education and training of veterans.
Mr. Brisbin notified the State Approval Agency that plaintiff had leased his equipment and had surrendered his certificate; and as a result thereof that agency withdrew its approval of plaintiff’s school as an institution for the training of veterans.
In the meantime, and before plaintiff had leased his equipment to Mr. Brown, the Veterans’ Administration requested the Civil Aeronautics Administration to give them a statement that it felt that the safety of the veteran trainees in plaintiff’s school was adequately safeguarded, although this Administration had previously notified the Veterans’ Administration that it had found that the plaintiff’s airplanes were airworthy, which was the investigation the Civil Aeronautics Administration had been requested to make. The Civil Aeronautics Administration replied reaffirming its former statement that their inspection of plaintiff’s aircraft led them to believe that they were airworthy.
*521 Mr. Brisbin then made a verbal request of the Civil Aeronautics Administration to make a further investigation of plaintiff’s facilities, and this was done. The Civil Aeronautics Administration found five alleged infractions of Civil Aeronautics Administration regulations, all of which, however, occurred prior to the date of plaintiff’s present contract with the Veterans’ Administration, except one. The Civil Aeronautics Administration then filed a complaint with the Civil Aeronautics Board asking a revocation of plaintiff’s certificate, but only presented to the Board one alleged infraction after the contract in suit, and one before. The evidence does not support the allegation of any infraction after the contract in suit, but it did show one infraction before the contract in suit, which was that an airplane had been used on one occasion when the brakes were not functioning.
The record discloses no justification for requiring plaintiff to suspend operations. The reports of irregularities received by the Regional Office were untrue.
The Veterans’ Administration had no right to close down plaintiff’s school on a mere accusation of irregularities. It had no right to do so unless these allegations were in fact true, or at least unless there was probable cause to believe them to be true. To say the least, permission to resume operations should have been given as soon as the report that the airplanes were airworthy had been received by the Veterans’ Administration. This was on August 17, 1947.
Moreover, the accusations made were not made in good faith; confessedly, they were a ruse to give the Veterans’ Administration an opportunity to investigate a rumor that plaintiff had defrauded the Government, a rumor that turned out to be without any foundation in fact.
The conduct of the Veterans’ Administration in this case was indefensible; it was a flagrant breach of plaintiff’s rights under his contract. That contract gave the defendant the right to terminate it on 60 days’ written notice, but they did not follow this course; instead, they asserted the false claim that the airplanes were not airworthy, as a ruse to permit investigation of an equally false rumor that plaintiff had defrauded the Government, and on this pretext they sus *522 pended bis right to operate, and refused to give him permission to resume, even after they knew that their purported accusation was false.
The stipulation between the parties shows that the daily cost to plaintiff for the operation of his school was $252.00, and that the daily income under the contract was $398.55, or a profit of $146.55 for each day of operation. At the time of the suspension the contract had 201 days to run. Plaintiff is, therefore, entitled to recover the amount of $29,456.55.
There is, however, to be deducted from this amount whatever profit plaintiff realized from the lease of his aircraft and operating facilities to E. A. Brown.
Judgment will be suspended until the incoming of a stipulation by the parties showing this amount, or, in the absence of a stipulation within a period of 30 days, the case will be remanded to a Commissioner to take- proof and report thereon.
It is so ordered.
Madden, Judge; Littleton, Judge; and Jones, Ohief Judge, concur.
FINDINGS OF FACT
The court having considered the evidence, the report of Commissioner Wilson Cowen, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff is a citizen of the United States, and at all times material to this action he resided at Laredo, Texas.
2. On June 29,1947, plaintiff, as owner and doing business under the name of Edgerton Flying Service, entered into a written contract with the defendant, acting through the Veterans’ Administration, for the education and training of veterans as private pilots, commercial pilots, flight instructors, etc., pursuant to Public Law 346,78th Cong., as amended. The term of the contract ran from July 1,1947, to February 29, 1948, and was the second contract which plaintiff had entered into with the Veterans’ Administration for providing-education and training in flying for veterans at Laredo, Texas. The contract provided in pertinent part as follows:
*523 ARTICLE 1. INSTRUCTION
(a) The Contractor will provide instruction and the necessary books, supplies, and equipment therefor, as set forth in paragraphs (6) and (c) hereof during the period beginning July 1st, 1947, and ending February 29, 1948, for such eligible veterans who choose to enroll in and are accepted or retained in courses provided by the Contractor according to the standards of the Contractor and who are approved by the Veterans’ Administration as entitled to education and training under Public Law 346, Seventy-eighth Congress, as amended.
(b) The Contractor will provide such courses of instruction at the charges listed and described in Schedule 1 attached hereto or as set forth in the catalogs, bulletins, or other publications or schedules which are submitted herewith and identified in Schedule 1 as part of this contract.
(o) The Contractor will furnish outright to the veteran, as needed, such books, supplies, and equipment as are necessary for the satisfactory pursuit and completion of the courses as referred to in paragraph (b) above. It is understood and agreed that the books, supplies, and equipment to be so furnished will consist of those items required, but in no instance greater in variety, quality, or amount than are required by the Contractor to be provided personally by other and all students pursuing the same or similar courses.
(d) The Veterans’ Administration will compensate the Contractor for the books, supplies, and equipment provided in this Article as follows:
See Schedule 1.
ARTICLE 2. PAYMENT
(a) The Contractor will prepare and certify vouchers for tuition fees and other services as set forth in paragraph (5), article 1, in the manner and form prescribed by the Veterans’ Administration. Such vouchers will be presented by the Contractor and paid by the Veterans’ Administration at such intervals and covering such periods as indicated herein:
At the end of each month in arrears.
(b) The Contractor shall furnish to the Veterans’ Administration properly prepared and approved vouchers covering the charges for books, supplies, and equip *524 ment as set forth in paragraph (c), article 1, and containing a certification that the articles have been delivered to eligible veterans and that the institution has evidence of such delivery on hand and available for the inspection of the Veterans’ Administration. Such items may be vouchered with charges as set forth in article 2 (a), or, if desired by the Contractor, they may be submitted on a separate voucher immediately following the delivery of the books, supplies, and equipment to the veterans.
*****
ARTICLE 3. RECORDS AND REPORTS
The Contractor shall maintain records of attendance, deportment, and progress of veterans in training under this contract and shall make available such records and furnish such reports to the Veterans’ Administration at such intervals as may be mutually determined and as may be necessary and required by the Veterans’ Administration to administer the training of the veteran as required by the law.
ARTICLE 4. INSPECTION
The Contractor will permit the duly authorized representatives of the Veterans’ Administration to visit the place of instruction as may be necessary and examine the training facilities and work of the veterans in training under this contract.
ARTICLE 5. PRORATION OE CHARGES
The Contractor agrees that in the event any veteran in training under this contract withdraws or is separated from the institution prior to the completion of the term of his course, the charges made for tuition and other fees will be prorated as follows:
On the basis of actual flight and classroom ground instruction hours completed at rate set forth in schedule 1.
ARTICLE 6. TERMINATION
At any time and from time to time the Veterans5, Administration may terminate all or any part of this contract by giving to the Contractor 60 days notice in writing.
*525 3. Supplementary provisions of the contract and the specifications were contained in a document which was received in evidence as Plaintiff’s Exhibit 1. Included in the supplementary provisions was the following:
STATEMENT OF POLICY AND WILLINGNESS
Edgerton Flying Service Agrees:
1. To abide by the rules and regulations of the Veterans’ Administration regarding Veteran Training under Public Law 346.
2. To abide by the rules, regulations, and amendments set forth by the Civil Aeronautics Administration and the Civil Aeronautics Board. This School is listed on the mailing list of the Civil Aeronautics Administration Regional Office.
3. Only one set of text books, supplies, and equipment will be issued a student. Such issue will not be repeated in a course when they have been previously issued or owned by a student.
4. The Veteran will be charged for text books, supplies, and equipment at the prices required to be paid by nonveteran students taking the same or comparable courses.
4. During the time pertinent to this action, Marvin A. Harlan was the Manager and, as such, was the principal official in charge of the San Antonio, Texas, Regional Office of the Veterans’ Administration, and Albert W. Brisbin was Chief of the Vocational, Rehabilitation and Education Division in that regional office. Laredo, Texas, was within the San Antonio Region of the Veterans’ Administration. Included among the duties assigned to Mr. Brisbin were the approval of facilities for the training of veterans and the responsibility for determining that the training was adequate and that the safety of the students was properly protected.
5. Sometime prior to August 11,1947, Mr. Brisbin received some complaints regarding plaintiff’s operations. It was reported to the Veterans’ Administration that (1) the veterans were not receiving sufficient ground school training along with their flight training; (2) the maintenance of the aircraft used in the school was inadequate, and (3) various *526 types of flight maneuvers were being performed without proper safeguards and in violation of the regulations of the Civil Aeronautics Administration.
6. On August 11, 1947, a conference was held at the office of the Veterans’ Administration in San Antonio, at which Mr. Brisbin, as well as other employees of the Veterans’ Administration, and several employees of the Civil Aeronautics Administration were present. During the conference the Veterans’ Administration requested the CAA to make an inspection of the aircraft operated by the Edgerton Flying Service.
As a result of the discussion at the conference, Mr. Brisbin dictated the following letter, which was dated August 11, 1947, signed by Mr. Harlan, the Manager, and mailed to plaintiff.
Eeports have reached this office which indicate that maintenance practices in your institution may not be sufficient to adequately protect the veteran in training.
The Civil Aeronautics Administration has been requested to make a complete investigation of your school to determine that all required standards are being met. Pending the outcome of this investigation, the training of veterans now enrolled with you is suspended effective the close of business August 12,1947.
A representative of this office will call on you to assist in necessary action in regard to the enrollment status of veterans in your institution.
The above-quoted letter was not received by plaintiff in Laredo, Texas, until August 13, 1947.
7. On the same day, i. e., August 11,1947, Mr. Brisbin instructed two of his subordinates to proceed to Laredo, Texas, and to interrupt the training of all veterans at plaintiff’s school. The word “interrupt” was a term used by the Veterans’ Administration to describe the process by which a veteran was entirely separated from training status in a particular school. The interruption of the students required the preparation on Veterans’ Administration forms of specified information covering each student.
8. Pursuant to Mr. Brisbin’s instruction, a training facilities officer and a training officer of the Veterans’ Administration called at plaintiff’s school in Laredo, Texas, on August *527 12,1947. They informed plaintiff that the Veterans’ Administration had received complaints regarding his operations and that the purpose of their visit was to interrupt all veterans enrolled as students in his school.
Plaintiff immediately telephoned Mr. Brisbin, stating that he could not understand the basis for the action being taken by the Veterans’ Administration. Mr. Brisbin replied that complaints had been received that the aircraft used at the school were not airworthy and that since the lives of the students might be endangered, it was necessary to interrupt their training until an inspection could be made by the CAA to determine whether the planes were airworthy. At the same time, Mr. Brisbin read plaintiff the letter of August 11, 1947 (Finding 6), which plaintiff had not received at that time. Plaintiff requested that the Veterans’ Administration refrain from interrupting the students and stated that if the Veterans’ Administration would not interrupt the students at that time, he would cease operations pending the outcome of the investigation by the CAA. Mr. Brisbin thereupon stated that if plaintiff would give the Veterans’ Administration representatives a written agreement to that effect, no action would be taken at that time to interrupt the students.
Mr. Brisbin also talked over the telephone with one of his subordinates and instructed him not to interrupt or separate the G. I. students from the school in view of plaintiff’s agreement to suspend operations.
9. Promptly after the telephone conversations, one of the Veterans’ Administration representatives dictated and plaintiff signed the following letter, which was dated August 12, 1947:
VeteRans’ Administration,
San Antonio Regional Office,
San Antonio, Texas.
Confirming my telephone conversation of this date with Mr. Arthur W. Brisbin, Chief, Training Section, I do state that I have ceased operations as of close of business as of this date, August 12, 1947, and will not re-open operation until authorized by the proper authorities of the Veterans’ Administration, and I also state that my records are available to Representatives of the Veterans’ Administration and any other authorized agency, for inspection.
*528 10. In accordance with a request that had been made by the Veterans’ Administration, Mr. Burns and Mr. Pechanec, aeronautical inspectors of the CAA, called at plaintiff’s school in Laredo on the morning of August 11, 1947, prior to the arrival of the Veterans’ Administration representatives, and began an inspection of plaintiff’s aircraft. After the inspection was concluded, the inspectors informed plaintiff that they had found the aircraft to be in an airworthy condition. The Veterans’ Administration representatives were present at plaintiff’s school during a portion of the time that the inspection was being made, but the evidence does not disclose whether the results of the inspection were made known to them at that time.
Except for the inspection of the aircraft, no investigation of plaintiff’s flying school was made by the CAA inspectors on the occasion of their visit to the school.
On August 14, 1947, Mr. Burns, whose office was located in San Antonio, Texas, reported the results of the inspection of plaintiff’s aircraft by a letter addressed to the Veterans’ Administration, San Antonio, Texas, for the attention of Mr. Harlan, the Regional Manager. The letter read as follows:
In reference to your request of August 11, 1947, for this office to conduct an inspection of the Edgerton Flying Service of Laredo, Texas, I would like to submit the following.
Inspector Pechanec and myself inspected the aircraft based at Laredo on August 12th and found them in an Airworthy condition as of that date.
On August 13th I inspected two aircraft used at the Edgerton school Number Two in Freer, Texas. While both aircraft were in an Airworthy condition one of them (Piper J3, NC59426) showed conclusive evidence of a lack of routine maintenance and upkeep.
A third aircraft which is listed for the Freer operation was not on the field at the time, the operator stating that the aircraft was on a cross-country flight to Dallas at the time.
If we can be of any further service to you please feel free to call' on us.
The date stamps on the foregoing letter, which is in evidence as Defendant’s Exhibit 8, show that it was received *529 in Mr. Harlan’s office on August 17,1947, and in Mr. Brisbin’s office at the same address on August 19,1947.
11. After he was informed by the CAA inspectors that they had found his aircraft to be in an airworthy condition, plaintiff assumed that he would be authorized to resume the operation of his flying school as soon as the Veterans’ Administration received a report from the CAA. Therefore, plaintiff telephoned Mr. Brisbin several times after the inspection had been made to inquire whether the report had been received in San Antonio. On each occasion Mr. Brisbin stated that the report had not been received.
Plaintiff then called on his attorney in Laredo for assistance in obtaining permission from the Veterans’ Administration for re-opening the school. On August 15,1947, plaintiff, his attorney, and Colonel Pearcy, the Director of Flying at the Laredo Municipal Airport, called on Mr. Brisbin at the latter’s office in San Antonio. In response to their inquiries, Mr. Brisbin informed them that he had not yet received the CAA report. However, he also stated that the lack of a report showing that the airplanes were in an airworthy condition was the only thing which was holding up the re-opening of the Edgerton Flying Service.
After failing to hear anything from the Veterans’ Administration by August 18,1947, plaintiff telephoned Mr. Burns of CAA in San Antonio and ascertained that the inspection report had been mailed to the Veterans’ Administration. Thereupon plaintiff, his attorney, and Colonel Pearcy, made another trip to San Antonio on the same day, that is, August 18,1947. Before calling on Mr. Brisbin, they stopped at Mr. Burns’ office and had him telephone Mr. Brisbin to inquire whether the latter had received Burns’ report of August 14, 1947. Mr. Brisbin informed Mr. Burns that the Veterans’ Administration was not ready to receive the report.
When plaintiff, his attorney, and Colonel Pearcy called on Mr. Brisbin the same day, Mr. Brisbin again stated that the CAA report had not been received and, therefore, that authorization for the re-opening of plaintiff’s school could not be granted. As shown in Finding 10 above, the CAA inspection report was received in the office of the Manager of the Veterans’ Administration in San Antonio on August *530 17,1947, but according to the date stamp on the letter, it was not received in Mr. Brisbin’s office until August 19,1947.
Plaintiff continued to urge his attorney to take action toward obtaining permission for the re-opening of the flying school and on August 20, 1947, plaintiff, his attorney, and Colonel Pearcy again visited the Regional Office in San Antonio. On that occasion they insisted on seeing Mr. Harlan, the Manager, who talked to the attorney and Colonel Pearcy outside plaintiff’s presence. Plaintiff’s attorney inquired why the school was still under suspension after it had been ascertained that the airplanes were in an airworthy condition. He stated that he had heard a number of rumors and wanted to know the truth about the suspension. Mr. Harlan replied that plaintiff had defrauded the Government of a considerable sum of money and probably would be prosecuted. Mr. Harlan further stated that the Veterans’ Administration had no means of ascertaining whether plaintiff had defrauded the Government but that an investigation would be made by the Federal Bureau of Investigation. In the same conversation, Mr. Harlan admitted that plaintiff’s fraud induced the defendant to take the steps which resulted in the closing of plaintiff’s school and that the explanation for such action as stated to plaintiff on August 12, 1947, i. e., the lack of airworthiness of his airplanes, was merely a device for prolonging the investigation.
12. About August 22,1947, a Special Agent of the Federal Bureau of Investigation called at plaintiff’s school in Laredo for the purpose of auditing plaintiff’s books and records. Although plaintiff was advised by his attorney that he was not required to make the books available to the FBI, plaintiff permitted the Special Agent to proceed with the audit, which was completed in a period of about ten days.
When the audit was completed, plaintiff and his attorney requested that they be furnished with a report, but were informed that the report would be made to the United States District Attorney and that their request should be made to that official.
The first term of the United States District Court, which was held in Laredo after plaintiff’s books were audited, was in November 1947. At that time, the U. S. District Attorney *531 informed plaintiff’s attorney that the FBI audit disclosed that there were a few discrepancies in favor of the Government and a few in favor of plaintiff and that the net amount of such discrepancies amounted to about $60. The District Attorney also stated that the investigation did not provide any basis for an indictment against plaintiff and that he did not request the grand jury to indict plaintiff.
13. As of August 12, 1947, when plaintiff’s school was closed, the Veterans’ Administration was indebted to plaintiff in the sum of approximately $30,000 for services performed under the contract prior to that date. The Veterans’ Administration withheld payment of these funds pending the investigation of plaintiff’s records. In December 1947, after it was determined that plaintiff would not be indicted for fraud, the Veterans’ Administration paid plaintiff the amount due under the contract up to the date the school closed.
Plaintiff had borrowed money from a bank in Laredo to finance the purchase of the airplanes used in the flying school. The debt to the bank was evidenced by an installment note, which was secured by a mortgage on the airplanes. On August 12, 1947, plaintiff owed the bank approximately $30,000 on the note. The payments under the contract with the Veterans’ Administration constituted plaintiff’s only source of revenue for paying the debt to the bank. Consequently, after the school was closed and payment of the funds due plaintiff was withheld by defendant, plaintiff was unable to pay the installments due on the note.
14. On August 12,1947, about seventy-five veteran trainees were enrolled in plaintiff’s school. When they appeared after that date for flight or ground instruction, plaintiff informed them that operations had been suspended temporarily. Although two or three students asked to be separated so that they could attend another school, most of the trainees returned to the school at frequent intervals to inquire when the training would be resumed. After a lapse of three weeks, no trainees called at the school or made inquiries regarding the resumption of its activities.
15. Plaintiff was never authorized by defendant to resume training in his school. If he had attempted to give either *532 flight or ground instructions to any veteran trainee after August 12, 1947, the Veterans’ Administration would have taken action immediately thereafter to interrupt all the veterans enrolled in plaintiff’s school.
IS. Having failed in his efforts to secure permission from the Veterans’ Administration for the resumption of training in his school, plaintiff entered into a written lease contract with one E. A. Brown on September 9,1947, whereby plaintiff leased his aircraft and operating facilities to Brown for a period of one year. The agreement further provided that plaintiff would not operate his school during the continuance of the agreement.
During the time he operated the flying school, plaintiff held a valid air agency certificate, which was issued by the CAA and was a necessary prerequisite to the' operation of such a school. Since the regulations of the CAA prohibited the issuance and use of more than one air agency certificate for the operation and use of the same aeronautical facilities and equipment, plaintiff wrote the CAA on September 9, 1947, that he would surrender his certificate when the CAA made an inspection of the facilities in behalf of Mr. Brown.
Plaintiff did surrender his certificate and another in lieu thereof was issued to E. A. Brown.
On October 29, 1947, a contract, similar in terms to the contract in suit, was entered into between E. A. Brown and the Veterans’ Administration for the education and training of veterans in the school operated by Mr. Brown.
17. On September 10,1947, Brisbin was advised in a telephone call from plaintiff that he was giving notice that his contract with the Veterans’ Administration was to be can-celled and that E. A. Brown would operate a flying school with plaintiff’s equipment. In the same conversation, plaintiff stated that he had surrendered his air agency certificate.
Mr. Brisbin transmitted the information received in the telephone call to the State Approval Agency, and on the basis of the information furnished by Mr. Brisbin, the Director of the Approval Agency for the State of Texas notified plaintiff by letter dated September 17,1947, that approval of plaintiff’s school as an institution for the training of veterans *533 under Public Law 346 bad been withdrawn. The notice read as follows:
In accordance with your letter of August 12, 1947, addressed to the Veterans’ Administration Regional Office, San Antonio, Texas, in which you state that you have ceased operation as of the close of business August 12.1947, we are removing the name of Edgerton Flying Service from the list of institutions approved to train veterans under the provisions of Public Law 946.
This withdrawal approval voids our approval letters of January 20, 1947, for the objectives of Private Pilot Course, Commercial Pilot Course, Flight Instructor Course, Instrument Rating Course, Multi-Engine Class Rating Course, and our approval letter of October 7, 1946, for the objective of Airplane and Engine Mechanic.
The effective date of withdrawal of approval is August 12.1947.
18. Public Law 346 provides that the Administrator of the Veterans’ Administration may grant benefits authorized by that Act only when the veteran is pursuing training in an approved facility. Mr. Brisbin received a copy of the letter quoted in the preceding finding on September 23, 1947, and on the basis of that letter the Veterans’ Administration notified plaintiff on September 30,1947, that all veterans enrolled in plaintiff’s school were being interrupted as of the close of business August 12,1947. Attached to the letter, which was addressed to plaintiff on September 30,1947, was a memorandum which stated that the Training Facilities Section of the Veterans’ Administration had withdrawn approval of plaintiff’s flying school, effective as of August 12, 1947.
19. When Mr. Brisbin received the report of August 14, 1947 (Finding 10), from the CAA inspector who inspected plaintiff’s airplanes, Mr. Brisbin was not satisfied with the report, and on August 27,1947, he prepared, for Mr. Harlan’s signature, a letter to the CAA which read as follows:
Reference is made to your letter of August 14, 1947, concerning an inspection of the Edgerton Flying Service of Laredo, Texas.
It is noted that while you report all airplanes inspected were in an airworthy condition you indicate that maintenance and upkeep were inadequate in at least one case. Before authorizing the resumption of training in this *534 school, this Administration wonld like to have a statement that, as a result of your inspection, you feel that the safety of the veteran trainee is adequately safeguarded.
Under date of September 3, 1947, the CAA replied by letter as follows:
Reference is made to your letter of August 27, 1947, concerning an inspection of aircraft of the Edgerton Flying Service of Laredo, Texas.
This is to confirm the letter addressed to you by our inspector, Mr. Sam E. Burns, dated August 14, 1947, to the effect that on August 12, 1947, inspectors from our San Antonio Office inspected the aircraft of the subject school at Laredo, Texas, and considered them airworthy as of that date.
On August 13th, two aircraft used at the Edgerton Flying School No. 2, at Freer, Texas, were inspected and considered airworthy as of that date.
We trust this will furnish you with the necessary information.
Mr. Brisbin did not consider the above-quoted letter as responsive to the inquiry made in Mr. Harlan’s letter, because the CAA had failed to express an opinion to the effect that the lives of the veteran trainees were being adequately safeguarded in plaintiff’s school. Accordingly, Mr. Brisbin thereafter had several telephone conversations and conferences with representatives of the CAA. On September 12, 1947, the CAA wrote the Veterans’ Administration in San Antonio, Texas, as follows:
This letter is in reply to a verbal request made by Mr. Henderson and telephone conversation between our Mr. Brubaker and Mr. Brisbin on September 10, 1947, regarding additional information in answer to your letter to our San Antonio office dated August 11,1947.
As indicated in Inspector Burns’s letter of August 14, 1947, and our letter of September 3, 1947, inspection indicated the aircraft used in the Edgerton Flying Service were considered airworthy as of the date of inspection.
This is to advise that the other phases of school operation are still being investigated. Upon completion of investigation, should this office file a complaint against the operation, your office will be notified.
*535 20. By complaint filed with the Civil Aeronautics Board on November 18, 1947, the CAA sought the revocation of plaintiff’s airman certificate for five alleged infractions of CAA regulations. No hearing was held before the Civil Aeronautics Board on the complaint filed against plaintiff. As a result of a meeting held on January 27, 1948, the matters involved in the complaint were settled by compromise and the complaint was withdrawn.
21. The alleged infractions included in the above-described complaint involved flights with or by students.
Four of the alleged violations of CAA rules occurred prior to the time the contract in suit was executed, but the evidence offered was limited to only one of these infractions, which occurred in May 1947. It was alleged and the evidence shows that plaintiff authorized flights in one airplane, located at Mirando City, Texas, at a time when the brakes were not functioning.
With respect to the only infraction which allegedly occurred during the period covered by the contract in suit, the evidence establishes that the allegations in the complaint were untrue.
22. The Veterans’ Administration received notice on August 17, 1947, that an inspection had revealed that the aircraft were airworthy, and the evidence does not establish that the defendant had probable cause or reasonable grounds for refusing to grant plaintiff permission to re-open his school after such notice was received. Although there is slight evidence to the contrary, the greater weight of the evidence shows that the investigation of plaintiff’s flying school was prolonged and the payment of funds due him was withheld until after it had been ascertained that an indictment could not be returned against him, because the Veterans’ Administration suspected that plaintiff had defrauded the Government of a considerable sum of money. There is no evidence showing or tending to show that the defendant had probable cause for believing that plaintiff had perpetrated a fraud against the Government.
23. The defendant did not at any time give plaintiff written notice that his contract was being terminated in accordance with the provisions of Article 6 of the contract.
*536 24. It has been stipulated by the parties, and it is found by the Court, that if plaintiff had continued operations under the contract for the 201 days remaining under the terms thereof after August 12, 1947, the daily cost to plaintiff would have been $252.00, the daily income under the contract would have been $398.55, and plaintiff’s profit for each day of operation would have been $146.55. This amounts to a total profit of $29,456.55 for the 201 days.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law the plaintiff is entitled to recover.
The entry of judgment is suspended to await the filing of a stipulation by the parties showing the amount due plaintiff; or, in the absence of a stipulation within a period of 30 days, the case will be remanded to a Commissioner to take proof and report thereon.
On a stipulation by the parties stating that the amount due plaintiff, in accordance with the court’s decision, is $29,456.55, it was ordered February 2, 1954, that judgment for the plaintiff be entered for $29,456.55.