**Albert W. HIMFAR**
v.
**The UNITED STATES.**
**No. 328–60.**

United States Court of Claims.
Jan. 21, 1966.

Robert S. Grodinsky, Philadelphia, Pa., attorney of record, for plaintiff. Joseph B. Gildenhorn, Washington, D. C., of counsel.

John R. Franklin, Washington, D. C., with whom was Asst. Atty. Gen. John W. Douglas, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DAVIS and COLLINS, Judges.

PER CURIAM: *

Plaintiff in this action seeks to recover alleged damages resulting from the suspension by defendant of a certificate which authorized plaintiff to make shipments of manganese ore to the defendant in connection with the "Domestic Manganese Purchase Program." The General Services Administration drafted and published in the Federal Register, on July 9, 1952, a "Manganese Regulation: Domestic Manganese Purchase Pro-

gram," as revised and amended pursuant to the "sense of Congress" evidenced by the Defense Production Act of 1950.[1] The regulation described as its purpose: " * * * to establish a Program to encourage expansion of domestic production of manganese by providing a uniform price scale for small domestic producers of metallurgical grade manganese ores and concentrates. * * * " [2]

This regulation, *inter alia,* as amended and revised prior to September 2, 1954, set the expiration date of the program at June 30, 1958, and guaranteed minimum prices. It stated that anyone desiring to participate in the program by making sales to the General Services Administration (hereafter referred to as the defendant) of manganese ores that met the specifications detailed in the applicable regulations could make application to the nearest regional office of defendant in the form of a letter, postcard, or telegram, postmarked or dated by the telegraph office.

The plaintiff made such an application by letter dated February 5, 1953, in which he stated:

I would like you to send me a certificate authorizing me to make shipments under the Domestic Manganese Purchase Program. [Sec. 704, 64 Stat. 816, as amended, Pub. law 429, 82nd Cong.] My ore is metallurgical grade, Domestic Origin. All mines are located in Eastern Tennessee in the vicinity of Mountain City, Tenn. This program was authorized by D.P.A. on May 9, 1952. I have read this regulation and accept its terms and conditions. All ore or concentrate shipment will be over 40% manganese.

On October 12, 1953, F. W. Witt, Coordinator of Sales, Emergency Procure-

---

\* This opinion is based, with some additional discussion, on the opinion prepared, at the direction of the court under Rule 57 (a), by Trial Commissioner Paul H. Mc-Murray.

1. See findings 2 to 8, inclusive, for specific provisions of the Defense Production Act of 1950 and the regulation issued pursuant to the Act.

2. The regulation defined a "small domestic producer" as one whose total anticipated or actual production of manganese ore or concentrates mined and milled in the continental United States annually is less than 10,000 long dry tons.

ment Services, General Services Administration, Washington, D. C. (hereafter referred to as Witt), wrote to Albert W. Himelfarb[3] enclosing a Certificate of Authorization No. 3–112, entitling the plaintiff to participate in the Domestic Manganese Purchase Program, and a copy of the applicable regulation.

During the period from October 12, 1953, to September 2, 1954, the plaintiff delivered approximately 979 tons of manganese ore to the defendant, for which he was paid the sum of $97,727.33. In early August 1954, the defendant received information from various sources that the ore being delivered by plaintiff herein might be of foreign origin. Acting on this information Witt directed that the latest shipment from plaintiff be neither unloaded nor paid for, pending an investigation to ascertain whether or not the ore being offered was of domestic origin.

Prompted by defendant's refusal to pay for his last shipment of ore and by the existing rumors, plaintiff made a trip to Washington. On August 24, 1954, he was assured by the Director of the Compliance Division, GSA, that the investigation was currently being conducted on an expedited basis and that a report should be forthcoming within the "near future." On August 25, 1954, at Witt's request, plaintiff executed an affidavit wherein he certified that all manganese ore shipped by him and ore to be shipped in the future was mined, or would have been mined, within the United States.[4]

The preliminary reports submitted by agents of the Compliance Division of defendant revealed that some difficulty had been experienced in locating mines in production which were owned or leased by the petitioner, and they referred to the existence of rumors to the effect that plaintiff was mixing a higher grade foreign ore with a lower grade of domestic ore in order to upgrade the ore so that it would meet the minimum specifications required by the regulations. By

letter dated September 2, 1954, Witt suspended plaintiff's certificate, notifying him that, pending an investigation of his manganese operations, the defendant would no longer accept deliveries of manganese from him.

Upon receiving no further word from the GSA as to investigations being made or completed, plaintiff, on February 1, 1955, gave notice of an appeal from the action taken by Witt. After corresponding with plaintiff, the Board of Review set a date (March 24, 1955) for a hearing.

In considering the appeal of plaintiff, the Board of Review concerned itself primarily with two principal questions: (1) Was the appellant a producer of manganese ore under the Domestic Manganese Purchase Program regulation, and (2) Was manganese ore of a foreign origin blended with domestic ore for upgrading purposes. On the basis of these considerations and the evidence presented to it, the Board of Review concluded, in a decision rendered on May 4, 1955, that plaintiff had not violated the applicable regulation, and recommended reinstatement of his certificate, No. 3–112, and his right to resume shipments. This recommendation was approved and plaintiff was notified that his certificate had been reinstated. However, plaintiff was unable or unwilling to resume operations for several reasons which have been referred to in finding 57.

Plaintiff filed suit in this court for damages resulting from loss of anticipated profits for the perid from September 2, 1954 (the date of suspension of his certificate), to May 11, 1955 (the date on which he was advised of his reinstatement) ; loss due to deterioration of equipment; and loss of the pro rata use under a 2-year lease for his mining property.[5]

Plaintiff contends that the defendant, by its manganese regulation, offered to purchase up to 10,000 long dry tons of

---

3. Plaintiff Albert W. Himelfarb, changed his name by court order, to Albert W. Himfar on October 15, 1954.

4. Shortly thereafter, plaintiff was paid for all previous shipments.

5. Assuming liability is established, there is no dispute as to the amount of the damages under the last two items.

manganese, at a minimum price, and that plaintiff, by his letter of February 5, 1953, accepted the offer and consummated the contract. Plaintiff asserts that the regulation was an invitation to deliver ore to defendant which would be accepted and purchased subject to the following conditions: (1) the ore must meet minimum specifications set out in the regulation; (2) the shippers must be small producers; and (3) the ore must be domestic ore. Satisfactory compliance with these requirements obligated defendant to pay a fixed price under the applicable regulation. Plaintiff further contends that the subsequent suspension was entirely unreasonable and therefore defendant is liable for damages sustained by plaintiff as a result of the suspension.

It is defendant's claim that the alleged contract, as asserted by the plaintiff, must fail totally for lack of consideration moving to the defendant from the plaintiff. The crux of defendant's claim is that each shipment of ore, by anyone holding a certificate, if it met the three necessary conditions, created a contractual obligation on the part of the defendant to pay the designated price for such individual shipments.[6] But defendant also says that that is the only obligation the Government assumed. This contention is not accepted because it limits too strictly the defendant's obligation.

One of the purposes of the Defense Production Act of 1950 was to provide a supply of manganese ore without reliance on foreign sources. The Act sought to accomplish this purpose by encouraging the discovery of new ore sources through offers to buy manganese ore from small domestic producers, who placed themselves in the necessary posture to comply with the applicable regulation. As a measure of assuring interest in the program and the investment of capital, the defendant offered a substantial increase in the price prevalant in the world market during the period involved here. Relying on the defendant's offer to purchase manganese ore at a fixed price,

subject to the specifications set out in the regulation, plaintiff expended time and money in obtaining equipment, mineral leases, and manpower necessary for production of the ore. Nonetheless, defendant vigorously maintains that there is a total lack of mutuality and, therefore, no contract could possibly exist between the parties. This premise finds its rationale in the admitted fact that the plaintiff does not have any obligation by which the defendant could require delivery. However, plaintiff did place himself in a position to perform under the accepted terms of defendant's regulation. At substantial expense, plaintiff searched for and obtained domestic deposits of manganese ore, thereby complying with one of the primary objectives sought by Congress in passing the Defense Production Act of 1950.

The proper approach to a governmental arrangement of this type has been indicated by the decisions of this court in Padbloc Co., Inc. v. United States, 161 Ct.Cl. 369 (1963) and Radium Mines, Inc. v. United States, 153 F.Supp. 403, 139 Ct.Cl. 144 (1957). In the former, the court pointed out "that there are many situations in which the outline of the transaction appears unilateral but a return promise can * * * often be seen in a document, an act, or a course of conduct" (id., at 377–378). It was also noted that the modern trend in the law of contracts "looks toward holding, if justice so requires, one whose promissory words have induced significant action in reliance (even though there be no technical consideration in the narrow sense)" (id., at 379). In *Radium Mines* the court read an Atomic Energy Commission mining-circular ("Ten Year Guaranteed Minimum Price")—providing that the Commission would pay certain guaranteed prices for uranium ore (of a specified type) over a ten-year period—as ripening into a contract when it was accepted by the producer's putting itself in a position to supply the ore described in the circular. See, also, Aycock-Lindsey

---

6. Defendant does not deny, in fact its witnesses admit, that it would be required to accept shipments of ore which met the specifications set out in the regulation.

Corp. v. United States, 171 F.2d 518, 521 (C.A. 5, 1948).

In this case, as in *Radium Mines*, the Government's purpose was to induce persons to find and mine a wanted mineral, and this purpose was to be achieved by the payment of a guaranteed uniform price, higher than the then market price. As in *Padbloc*, the Government's language in its manganese regulation reasonably induced significant action by plaintiff in reliance upon the promise to receive and pay for the ore. At least in the case of a producer (like plaintiff) who expended efforts to find and obtain ore in response to the regulation—and who had been granted the required certificate—there arose an obligation on the part of the defendant to receive and pay for minerals falling within the requirements of the regulation. The consideration for this obligation was the plaintiff's finding of manganese and his efforts to produce it. There was, in a word an obligation and a promise by the defendant to allow the plaintiff to find, ship, and receive payment for such ore. This seems, also, to have been the view of the Office of Defense Mobilization which was directly concerned with this program (see finding 13(c)).

In these circumstances, it would be unduly harsh and unreasonable to permit the defendant to suspend the plaintiff's certificate when the suspension, precipitated solely by unconfirmed rumors, was later found to be unwarranted and was vacated. Such action would be a breach of contract. Edgerton v. United States, 117 F.Supp. 193, 127 Ct.Cl. 515 (1954). If defendant had good reason to believe that a certain certificate holder was proceeding in violation of the requirements specified in the regulation, it could terminate or revoke his certificate, notifying the certificate holder that any error or injustice had its remedy in a timely appeal to the Board of Review. There was no specific provision for suspension of the certificate either in the regulations or in the correspondence with plaintiff, but we can assume that there was a potential authority to suspend, if the facts warranted it, in the Administrator of the General Services Administration. But where, as here, the suspension-for-investigation proves to be unfounded and there was in fact no violation, the defendant cannot rely on some inherent power to investigate any suspicion or rumor of violation as justification for cutting off the producer's right to ship and receive payments "pending completion of an investigation of your Manganese operations."

Based upon consideration of all the evidence, it is found that the defendant acted unreasonably and without proper authority or substantial evidence in suspending the certificate of plaintiff and that, as a result of such unreasonable and improper action, the plaintiff sustained damages in the manner and amounts set out below.

As previously stated, damages sustained by plaintiff as a result of defendant's action in suspending the plaintiff's certificate can be divided into three categories, which are: (1) loss of anticipated profits for the period from September 2, 1954, until May 11, 1955, (2) loss of equipment, and (3) loss of the pro rata use under a 2-year lease (hereafter sometimes referred to as the Jenkins lease). If proved, these are proper elements of damage. Edgerton v. United States, supra, 117 F.Supp. at 196–197, 127 Ct.Cl. at 522. We shall be concerned solely with the amount of damages, if any, allowable under category (1), for there is no dispute between the parties as to the amount of damages under categories (2) and (3). The amounts for those items are as follows: For the second category, $6,136.48, and for the third category, $1,350.

The measure of damages allowable under category (1) presents a problem that is not without minor complications. The evidentiary guides are few, for they consist solely of plaintiff's operations reflected by the books of the Virtennco Cor-

poration and the testimony of defendant's auditors regarding these books.[7]

█ Regardless of the problems which may arise in any attempt to prove anticipated profits, it is not necessary that plaintiff present proof of the amount of damages with an absolute certainly. As stated by this court in Chain Belt Company v. United States, 115 F.Supp. 701, 714, 127 Ct.Cl. 38, 59 (1954):

> * * * The more recent and general view of the courts seems to be that if the fact of damage, that is, lost profits, is certain, uncertainty as to the precise amount lost is not necessarily fatal to recovery. * *

Plaintiff has used as the measure of damages a computation which is based on a recovery of profits for an 8-month period of suspension at the same rate which prevailed during the 8 months preceding suspension, without an allocation of exploration costs. The defendant's theory for measuring damages differs from plaintiff's in that defendant includes the expenses for the additional period from August 1, 1953, to December 31, 1953. It is concluded that the record and better reasoning dictate the use of a monthly profit rate based on a 13-month period (August 1, 1953 to September 2, 1954), with an allocation of exploration costs over a period of 3 years and the application of the 8-month suspension period to the monthly profit rate in arriving at a proper measure of damages under category (1).

Beginning with August 1, 1953, the date of opening of the books of the Virtennco Corporation, and ending with September 2, 1954, the date of Witt's suspension letter, the defendant's audit revealed that the company incurred expenses of $19,288.32 for the period from August 1, 1953, to December 31, 1953, and $55,340.37 for the period January 1, 1954, to September 2, 1954, for total expenses of $74,628.69 for the two periods. During this entire time the income from sales of manganese ore to the defendant was $97,727.33, which income was substantially received during the latter period. The net overall operating profit for the 13 months amounted to $23,098.64, without any allocation of exploration costs ($97,727.33 less $74,628.69).

█ According to the audit, the expenses incurred during the early period of operation, or during 1953, included an amount of $10,992.35 for exploration costs. This item consists of those costs incurred in exploration and development of the mining venture, and, as such, would normally be allocated over a period of years, rather than charged in its entirety to current operations. The record does not contain a plethora of information from which a period of time might be derived for such an allocation. However, the record does establish that the petitioner had been in operation since August 1953 and that no mining lease held solely by the petitioner extended beyond 1956. For this reason it is concluded that 3 years is a reasonable period over which to allocate the exploration and development costs. After an allocation of these costs, the net profit for 13 months is recalculated to be $30,121.53, with the monthly profit rate being $2,317.04 which yields a final figure for loss of anticipated profits of $18,536.32.

█ It is therefore found that plaintiff is entitled to recover a total of $26,022.80, as outlined under the following categories:[8]

Loss of profit (8 months) ............................$18,536.32
Loss of equipment ..................................... 6,136.48
Pro rata loss of use on a 2-year lease .................... 1,350.00

Total ...........................................$26,022.80

7. Since plaintiff kept records of his operations through the corporate entity of Virtennco, it is not unreasonable to assume that the books of Virtennco Corporation realistically reveal his income and expenses for the periods from August 1, 1953, to December 31, 1953, and from January 1, 1954, until September 2, 1954.

8. For detailed computation of these amounts see findings 58 to 63, inclusive.